UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

THE ESTATE OF JEFFREY LYNN FILEK,
deceased, by the Personal Representative,                    Case No. 14-cv-14088
JEFFREY D. FILEK,

                                                            Paul D. Borman
                          Plaintiff,                        United States District Judge

v.

NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, PA,

                          Defendant.
_____/

OPINION AND ORDER (1) GRANTING DEFENDANT'S AMENDED
MOTION FOR SUMMARY JUDGMENT (ECF NO. 15),
(2) DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (ECF NO. 16), AND
(3) DENYING AS MOOT PLAINTIFF'S MOTION TO STRIKE (ECF NO. 14)

        This action involves Plaintiff's claim that the decedent, Jeffrey Lynn Filek, an over-the-road

truck driver, suffered an "occupational accident" when he died from a pulmonary embolism while

on the job, in his truck, and parked overnight in a truck stop.  Plaintiff claims that Mr. Filek's death

by pulmonary embolism was a covered loss under a policy of occupational accident insurance issued

by the Defendant, National Union Fire Insurance Company ("National Union").  Plaintiff also claims

that National Union denied the claim in bad faith, entitling Plaintiff to treble damages. National

Union responds that the occupational accident policy does not cover the Filek claim because: (1) Mr.

Filek's pulmonary embolism was not an "injury" as defined under the occupational accident policy

because it was not caused by an accident and (2) Mr. Filek's pulmonary embolism was a  "sickness

or disease" that was excluded from coverage under the policy.

        The parties filed cross-motions for summary judgment (ECF Nos. 15, 16) and the Court held

1

a hearing on March 16, 2016. Following the hearing, the parties engaged in facilitative mediation but were unable to resolve the matter. For the reasons that follow, the Court now GRANTS Defendant's motion for summary judgment, DENIES Plaintiff's motion for summary judgment and DENIES AS MOOT Plaintiff's motion to strike the testimony of Defendant's expert.

## I.    BACKGROUND

### A.    The Coroner's Report

On March 2, 2012, Jeffrey Filek, an over-the-road truck driver, suffered a pulmonary embolism while parked and seated in the cab of his truck, apparently working on his log sheets at the time of the fatal event. Def.'s Mot. Ex. B, Certificate of Death; Ex. C, Coroner's Report; Exhibit L, Deposition of Dr. Edward Adelstein, Deputy Medical Examiner at the University of Missouri, 38:13-23. Dr. Adelstein's Coroner's Report concludes: "In my opinion, the cause of death of Jeffrey Filek is a large saddle pulmonary embolus. His manner of death is ruled natural." Def.'s Mot. Ex. C, Coroner's Report 1. Dr. Adelstein was required to select one of five categories for determining the manner of death: suicide, homicide, undetermined, natural or accidental. Adelstein Dep. 19:15-20. He chose natural.

Mr. Filek had phoned his wife at approximately 4:00 a.m. the morning of his death and told her that he was having chest pain. Adelstein Dep. 22:10-13, 48:2-4. The autopsy revealed that Mr. Filek had consumed five 81mg (low dose) aspirin that were "just laying in his stomach" and had not been absorbed into his system at the time of death. Adelstein Dep. 29:3-13. From this, Dr. Adelstein surmised that Mr. Filek "had chest pain or he had shortness of breath and the only thing he knew to do was to take aspirins like they tell you to do. But it didn't do any good." *Id*. at 29:5-10.

2

Dr. Adelstein offered the following layman's definition of a pulmonary embolism:

> In layman's terms it means that a clot forms generally in the lower part of the body and travels up the large vein that goes through the heart and that large vein then goes into the right side of the heart.  And the right side of the heart pumps the blood directly to the lungs.  And then that vein – and then when that clot gets up there it gets out the pulmonary artery and the pulmonary artery then it either breaks off or it fills up the pulmonary artery on both sides, hence the saddle, meaning it covers both sides.
>
> And when that happens, death is pretty usually instantaneous. . . . [W]hen you have what we call a massive pulmonary saddle embolus, then the blood is cut off instantly to the – to the lungs and there's no oxygen given to the heart and the heart becomes irritable arythmia and dies.

Adelstein Dep. 11:23-12:13.

As to the cause of pulmonary emboli generally, Dr. Adelstein offered the following explanation:

> The causes are variable.  I would say today the most common cause that we see is associated with people that have a lifestyle that is pretty stagnate that they don't move a lot.  It's often seen in people that are obese, but not always.  It's often seen in the – and my most common history is in people that sit for long period of time in airplanes and in this case – and some in trucks.
>
> But mainly the common denominator would be people who sit for a long time that are not in great shape, don't get up, they have dilated veins of the lower extremities and those clots form there.  It could occur in fairly healthy people that sit, such as the guy Dan Quail [sic], who as you know was the vice president.
>
>       *       *       *
>
> There are other people that have what I would call hypercoagulability syndromes. That is they want to clot. Okay? And these are people that have genetic abnormalities. . . . And if that would have been an issue here, he would have already had problems.

Adelstein Dep. 12:16-13:14.

Dr. Adelstein also explained that obesity "does increase the risk somewhat," but would not be a sole cause.  *Id*. at 13:15-23.  In the morbidly obese population, there is "an extraordinary high

3

risk of pulmonary emboli." *Id*. at 14:5-10. Dr. Adelstein further explained that Mr. Filek, who was 6'1" and weighed 247 pounds, was not in the "morbidly obese" category, but was an average overweight American who ideally should have weighed around 180 to 190 pounds. *Id*. at 14:11-13; 15:1-10. Mr. Filek, who had type II diabetes, had decreased his weight in the ten years preceding his death from 300 pounds to 247 pounds at the time of his death, indicating to Dr. Adelstein that Mr. Filek had been following medical advice on controlling his Type II diabetes. *Id*. at 15:11-15. To Dr. Adelstein's knowledge, diabetes is not a risk factor for a pulmonary embolus. *Id*. at 14:20-23. Mr. Filek also suffered from cardiac disease, which Dr. Adelstein identified as a risk factor, but one that is difficult to quantify. *Id*. at 39:5-14. In sum, Dr. Adelstein described Mr. Filek as "not a healthy individual." *Id*. at 16-19. Dr. Adelstein was clear, however, that Mr. Filek's cardiac disease did not cause his pulmonary embolism and neither was there any evidence of trauma or some type of traumatic accident that caused or contributed to the pulmonary embolism. *Id*. at 53:11-18.

At the time of his deposition, Dr. Adelstein expressed the further opinion that Mr. Filek's pulmonary embolism was "strongly related," or "more likely than not" related, to his "choice of occupation" as a truck driver. Adelstein Dep. 29:18-30-3; 20:4-9; 21:5-13. Dr. Adelstein stops short, however, of opining that Mr. Filek's pulmonary embolus was caused by his occupation. *Id*. Dr. Adelstein explains that sitting for extended periods of time is a risk factor for a pulmonary embolism and "generally speaking, people who have inactivity, people who sit for a long time tend to form more emboli tha[n] other people do." *Id*. at 54:2-3, 55:5-7. Dr. Adelstein testified that people who must sit for long periods of time can decrease the risk of pulmonary emboli by getting up and moving every three to four hours and wearing compression socks while sitting. *Id*. at 36:1-9.

Dr. Adelstein testified that the risk to truck drivers of developing a pulmonary embolism was considered "a normal" risk of the occupation. Discussing a study done in Copenhagen, Denmark involving truck drivers, the risk of forming such emboli was well demonstrated:

> [S]o they compared [the drivers] to a non-group and their conclusions were there is mounting evidence that prolonged cramping with – increases the risk of venous thrombosis and pulmonary embolus. So I consider it as it's a normal risk. And in this article there's also 30 other articles that all say, yes: sitting for a periods of long times [sic] increases your chances of getting a pulmonary embolus.

Adelstein Dep. 35:12-25.

Dr. Adelstein was not aware of when Mr. Filek had last driven his truck prior to his death, nor was he aware of how long Mr. Filek had been sitting just prior to his death, or whether he had been walking around or perhaps laying down for some period of time before suffering the pulmonary embolism. Adelstein Dep. 38:24-35:4. Dr. Adelstein could not say to a reasonable degree of medical certainty that sitting was the only risk factor or cause of Mr. Filek's pulmonary embolism, conceding: "There may be other risk factors that I don't know." *Id*. at 36:22-25.

### B.     National Union's Claims Investigation and Denial of the Filek Claim

At the time of his death, Mr. Filek was insured by National Union, a subsidiary of AIG Corporation, under a "Truckers Occupational Accident Insurance" Policy, Policy Number TRK 9028670-A, which included the following Riders: Excess Benefits Rider, Hemorrhoids Rider, Hernia Benefit Rider, Non-Occupational Coverage Rider, Seat Belt Benefit Rider, Pre-Existing Condition Rider and Advance Payment Rider. Pl.'s Mot. Ex. B, Policy, Policy Riders and Endorsements, PgID 526. The Policy provides the following with respect to an Accidental Death Benefit:

> **Accidental Death Benefit.** If Injury to the Insured Person results in death within the Incurral Period shown in the Schedule, the Company will pay the Principal Sum

5

shown in the Schedule.  The Incurral period starts on the date of the accident that caused such Injury.

Pl.'s Mot. Ex. B, Policy Section IV, BENEFITS, PgID 534.  The Policy defines "Injury" as follows:

**Injury** means bodily Injury to an Insured Person caused by an Occupational accident while coverage is in force under this Policy, which results directly from and independently of all other causes in a Covered Loss.   Injury also includes Occupational Cumulative Trauma as hereafter defined.

Pl.'s Mot. Ex. B, Policy, Section I, GENERAL DEFINITIONS, PgID 530.  "**Occupational** means, with respect to an activity, accident, incident, circumstance or condition involving an Insured Person, that it occurs or arises out of or in the course of the Insured Person performing services within the course and scope of contractual obligations to the Contractee.  Occupational does not encompass any period of time during the course of everyday travel to and from work."   *Id*.

"**Occupational Cumulative Trauma** means bodily Injury to an Insured Person caused by the combined effect of repetitive Occupational activities extending over a period of time, where: (1) such condition is diagnosed by a Physician; (2) the Insured Person's last day of last performance of the activities causing the Injury occurred during the Policy Period; and (3) such activities resulted directly and independently of all other causes of a Covered Loss.  *Id*.

The Policy contains a host of exclusions, including one barring losses caused in whole or in part by a "sickness or disease:"

This Policy does not cover any Pre-existing Conditions or any losses caused in whole or in part by, or resulting in whole or in part from, the following:

2.  sickness, disease or infections of any kind, except bacterial infections due to an accidental cut or wound, botulism, or ptomaine poisoning.

Pl.'s Mot. Ex. B, Policy, EXCLUSIONS, Section VI, PgID 543.  Mr. Filek had purchased a Pre-Existing Conditions Rider.  The Policy defined a Pre-Existing Condition as follows:

6

> **Pre-Existing Condition** means a sickness, disease or other condition of the Insured Person that, in the twelve (12) month period before the Insured Person's coverage began: (a) first manifested itself, worsened, became acute or exhibited symptoms which would have caused an ordinarily prudent person to seek diagnosis, care or treatment; (b) required taking prescribed drugs or medicine, unless the condition for which the prescribed drug or medicine is taken remains controlled without any change in the required prescription; or (c) was treated by a Physician or treatment had been recommended by a Physician.

Pl.'s Mot. Ex. B, Policy, GENERAL DEFINITIONS, PgID 531.  Mr. Filek does not claim that he suffered from a Pre-Existing Condition in this action and does not appear to invoke the Pre-Existing Condition Rider.  In any event, the Pre-Existing Conditions Rider pertains only to a "Covered Loss," which means in this case that the loss must first qualify as "bodily injury caused by an occupational accident."  Pl.'s Mot. Ex. B, Policy, PgID 549.

On March 5, 2012, Kim Filek, Mr. Filek's spouse and the beneficiary under Mr. Filek's policy, called in a claim for Mr. Filek's death under the Policy.  Pl.'s Mot. Ex. C, PgID 553, Call-In Claim Sheet.  This Occupational Accident Claim Call-In Sheet states that Ms. Filek reported that her husband was "under a load but stopped for the night" when he suffered a pulmonary embolism.  *Id.*  She reported that she had talked with Mr. Filek at 10:30 p.m. and when she called to check on him at 9:20 a.m. the next morning, March 2, 2012, he did not answer his phone.  *Id.*  She reported that the medical examiner thought Mr. Filek had died at about 7:00 a.m. of a "heart attack and pulmonary embolism."  *Id.*  On May 15, 2012, Mrs. Filek, filed an "Occupational Accident Plan Death Claim Proof of Loss (Accident)," attaching Dr. Adelstein's Coroner's Report and drug screen results.  Pl.'s Mot. Ex. C, PgID556-561.

The Filek claim was initially reviewed by Harry Dawson, a Senior Claims Adjustor with Gallagher Bassett, the Third Party Administrator for the National Union Policy.  Mr. Dawson was assigned to handle solely occupational accident claims for Gallagher Bassett.  Def.'s Mot. Ex. M,

July 17, 2015 Deposition of Harry Dawson 7:6-8, 8:15-9:19.  As a general matter, Mr. Dawson had the authority to deny or pay claims but, in the event of a death claim, Mr. Dawson was limited to making a recommendation to the carrier, AIG, for their review and approval.  Dawson Dep. 10:14-16, 11:13-23, 12:5-13.  There was no question, on the Filek claim, that the claim was timely and that premium payments were up to date.  *Id*. at 30:24-31:16.

Mr. Dawson's claim review and recommendation to AIG involved determining (1) whether there was an injury, defined by Mr. Dawson as "physical trauma" and (2) whether it was the result of an accident, defined by Mr. Dawson as "something unforeseeable that occurred that involved a physical injury."  Dawson Dep. 20:16-25, 23:3-13.  Mr. Dawson explained the coverages under the Filek policy as follows:

> [The Policy] covered work-related accidents and also nonwork-related accidents up to a small limit that was called nonoccupational coverage.  The occupational coverage . . . had an accidental death and dismemberment portion that would pay for an accidental death or dismemberment.

Dawson Dep. 25:9-17.  Mr. Dawson gave the following examples of "accidents" that might be covered under the Policy:

> Slip and fall, if they were in a motor vehicle accident while driving the truck, lifting injuries, maybe getting struck by a door or struck by objects falling, stepping in a hole while you're unloading – I mean that kind of thing.

> \*                        \*                        \*

> Nonoccupational would be when they were not on duty, if they were at home and they fell off a ladder or any number of things.  It provided a smaller medical coverage only up to a certain limit.

> \*                        \*                        \*

> [The accidental death provision] would pay the benefit if a driver was killed accidentally while on duty.  And I mean the same types of accidents would apply if he fell off the truck and died or if he was in a motor vehicle accident.

8

Dawson Dep. 26:6-10, 17:21, 27:1-10.

Mr. Dawson recommended denying the Filek claim based upon "the death certificate and the autopsy, it appeared he died of – I think it was a pulmonary embolus and resulting in a heart attack, which is a sickness condition. It did not result from an accident." Dawson Dep. 29:10-14; 52:16-24. Dawson later clarified that the denial was based on death caused by a pulmonary embolism, falling under the exclusion of a sickness condition, not by a heart attack. Dawson Dep. 38:6-13; 67:19-68:5. Dawson also was of the opinion that a pulmonary embolism did not qualify as "occupational cumulative trauma" because it involved no "trauma." Dawson Dep. 62:9-22. The claim denial was not based on a finding of a pre-existing injury. *Id*. at 65:5-8. In reaching the decision to deny the claim, National Union relied on (1) the death certificate, (2) the autopsy report, (3) Mrs. Filek's Proof of Loss and (4) the toxicology report. Dawson Dep. 31:17-24. Other than reviewing these documents, National Union did no further research and did not consult with medical professionals regarding pulmonary embolism or heart attack. He relied on the medical examiner's opinion. *Id*. at 32:2-9; 35:5-10.

Mr. Dawson forwarded his recommendation on the Filek claim to Myra Zimmerman at AIG for her approval. Dawson Dep. 58:15-59:14. Based on Dawson's review and Ms. Zimmerman's approval, National Union denied the claim concluding that the "cause of death was sickness related and unrelated to an accident," citing Dr. Adelstein's Report concluding the cause of death was a pulmonary embolism and was natural, not accidental. Def.'s Mot. Ex. D, June 22, 2012 Denial Letter; Dawson Dep. 67:11-18.

Mrs. Filek appealed the original claim denial through her attorney in this matter, Christopher Trainor. Def.'s Mot. Ex. E, August 24, 2012, Notice of Dispute/Written Appeal; Dawson Dep.

27:15-21.  Upon receipt of the appeal, Mr. Dawson sought additional documentation from the claimant for purposes of reevaluating the claim which took several months to collect.  *Id*. at 13:20-23. Mr. Trainor ultimately submitted additional "medical" evidence in the form of a letter from Dr. Adelstein that summarized Dr. Adelstein's autopsy findings and his deposition testimony that "the death of Mr. Filek is strongly related to his choice of occupation."  Def.'s Mot. Ex. H, Adelstein Letter; Dawson Dep. 13:24-14:16.

Upon receipt of the additional information related to the appeal of the Filek claim, Dawson sought guidance from his supervisor, Kim Fitch.  Dawson Dep. 12:22-13:2.  Ms. Fitch was a supervisor at Gallagher Bassett in 2012, overseeing occupational accident claims.  Def.'s Mot. Ex. N, July 17, 2015 Deposition of Kimberly K. Fitch 8:4-6.  Ms. Fitch was aware of the Filek claim but was not involved in the initial recommendation of denial made to AIG by Mr. Dawson.  Dawson Dep. 20:19-21:3, 22:4-23:1.  Ms. Fitch, who confirmed that no medical "peer review" or independent medical opinion was obtained in processing the Filek claim, forwarded the appeal and documentation directly to AIG, to Ms. Elaine Langley, an Accidental Death and Dismemberment (AD&D) claims examiner at AIG, for review. Dawson Dep. 14:21-15:10, 15:19-22; 73:17-74:18; Fitch Dep. 18:2-9, 18:18-20, 20:15-22.  Ms. Fitch's role was limited to reviewing the Filek  claim file notes to verify that it had been denied but she did not review the underlying documentation, such as the autopsy report, and did not engage in any independent investigation into the denial before forwarding the claim directly to Ms. Langley at AIG, requesting a "rush response." Fitch Dep. 23:8-18. 23:24-24:24, 38:1-13.  Ms. Langley responded the next day, explaining that nothing in the additional documentation provided with the appeal would cause AIG to alter their original determination. Def.'s Mot. Ex. I, 2/19/14 email.  Ms. Langley further instructed Ms. Fitch regarding

what Ms. Fitch should include in her letter to Mr. Trainor denying the appeal. Ms. Langley instructed that Ms. Fitch refer to both the sickness and disease exclusion as well as definition of Injury provision, placing equal emphasis on the fact that Mr. Filek's death was not due to a bodily injury caused by an accident. *Id.*

Although Ms. Fitch did write a letter to Mr. Trainor on November 18, 2013, informing him that the claim was under further review, and did write a letter to Mr. Trainor on February 19, 2014, informing him that the denial had been affirmed and that no payments would be made on the claim, Ms. Fitch reiterated that she was not responsible in any manner for making decisions regarding the Filek claim. Fitch Dep. 30:1-4, 31:8-32:8, 32:9-14, 32:18-33:13; Def.'s Mot. Ex. J, February 19, 2014 Denial Letter. Ms. Fitch explained that in authoring the final denial letter, she served as the "messenger" and submitted the letter on Ms. Langley's instruction. Fitch Dep. 33:14-34:12.

Although Ms. Fitch did not have any input into the decision-making process that led to the denial of the Filek claim, she did form an opinion, on a subsequent review of the claim file in November, 2014, that the claim had been properly denied. She believed the claim denial was appropriate because Mr. Filek's pulmonary embolism was a sickness condition, based on the death certificate and the coroner's determination of death by natural cause, and because there had been no "accident" such as a motor vehicle accident or getting hit by something or falling. Fitch Dep. 26:3-27:1, 27:11-25. Ms. Fitch defined a "sickness condition" as "an illness," something that is "not caused by an accident." Fitch Dep. 28:6-9.

Ms. Fitch also explained her interpretation of "cumulative trauma," which she did not believe had any application to Mr. Filek's claim:

> Cumulative trauma is something like a repetitive motion injury caused from either
> a trauma or like an example would be carpal tunnel or from hitting a bump in the

> road and getting back pain or back injury from repetitive bumping, something to a muscle or joint or some kind of injury cause from that over an cumulative amount of time.

Fitch Dep. 35:3-15.    Ms. Fitch also identified the exclusion section of the Policy on which AIG and National Union relied in denying the claim, which excludes recovery for "sickness, disease or infection." Fitch Dep. 35:18-23.  Ms. Fitch did not consider, at the time she formed her opinion regarding the denial of the claim, Dr. Adelstein's statement that the death of Mr. Filek was strongly related to his choice of occupation.   However, when asked to consider it at her deposition, she concluded that it would not have affected her opinion that the claim was properly denied:

> [Dr. Adelstein] says it's strongly related to his choice of occupation, but he doesn't say that it's related to an occupational accident or a bodily injury caused from an occupational accident.

Fitch Dep. 37:9-12.

Ms. Langley, the AD&D claims examiner for AIG in March, 2012, was responsible for reviewing claims on behalf of third-party administrators such as Gallagher Bassett.  Deposition of Elaine Langley, August 3, 2015 7:16-23.  Ms. Langley confirmed that she reviewed the appeal of the denial of the Filek claim and concluded that AIG's initial determination that the accidental death claim was not covered under Mr. Filek's Occupational Accident Policy was correct because "there was no indication provided that the insured had sustained a bodily injury as a result of an accident." Langley Dep. 14:1-7.  In reaching her conclusions, Ms. Langley reviewed: 1) the information submitted by Mrs. Filek, 2) the claim form submitted by Mrs. Filek, 3) the coroner's report, 4) the initial email between Mr. Dawson and Ms. Zimmerman, 5) the file notes created by Gallagher Basset and 5) the follow-up letter from Dr. Adelstein to Mr. Trainor.  Langley Dep. 15:10-16:4.  Ms. Langley did not speak with Dr. Adelstein in her review of the claim.  *Id*. at 17:13-15.

12

Ms. Langley explained her interpretation of occupational cumulative trauma required the insured to establish "bodily injury caused by the combined effect of repetitive occupational activities extending over a period of time," that is diagnosed by a physician, the last episode of which occurs during the policy period and that result directly from the repetitive activities to the exclusion of all other causes *in a covered loss*. *Id*. at 18:4-7; 37:6-18.  Ms. Langley did not believe that the occupational cumulative trauma provision of the policy applied to Mr. Filek's claim because sitting in his truck for a prolonged period of time involved no "bodily injury," which under the express terms of the policy must be caused by "a traumatic assault on the body." *Id*. at 39:2-6.  Ms. Langley concluded:

> The loss must be caused by bodily injury caused by an accident in order for it to qualify under the accidental death benefit. . . . There's no indication that there was cumulative trauma injury to the insured.

*           *           *

> [T]he condition from which he died, a pulmonary embolism, is considered a sickness.  There was no evidence submitted, no documentation that the insured had sustained a bodily injury.

Langley Dep. 42:24-43:7, 45:17-21.

Ms. Langley also explained her understanding of the effect of Mr. Filek's pre-existing condition rider:

> Q: Exclusions are waived from the pre-existing condition rider.  Is that correct?
> A: Not necessarily.
> Q: If it's a covered loss.
> A: It has to be a covered loss.  It has to be an accidental bodily injury due to an accident.  And the rider is suggesting that if it's contributed to by a pre-existing condition, possibly it might be excluded.

Langley Dep. 29:15-24.

13

## II.     STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56, a party against whom a claim, counterclaim, or cross-claim is asserted may file a motion for summary judgment "at any time until 30 days after the close of all discovery," unless a different time is set by local rule or court order.  Fed. R. Civ. P. 56(b).  Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a);  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "Of course, [the moving party] always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323.  *See also Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987).

A fact is "material" for purposes of a motion for summary judgment where proof of that fact "would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties."  *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (quoting Black's Law Dictionary 881 (6th ed. 1979)) (citations omitted).  A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  Conversely, where a reasonable jury could not find for the nonmoving party, there is no genuine issue of material fact for trial.  *Feliciano v. City of Cleveland*, 988 F.2d 649, 654 (6th Cir. 1993).  In making this evaluation, the court must examine the evidence and draw all reasonable inferences in favor of the non-moving party.  *Bender v. Southland Corp.*, 749 F.2d 1205, 1210-11 (6th Cir. 1984).  "'The

14

central issue is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Binay v. Bettendorf*, 601 F.3d 640, 646 (6th Cir. 2010) (quoting *In re Calumet Farm, Inc.*, 398 F.3d 555, 558 (6th Cir. 2005)).

If this burden is met by the moving party, the non-moving party's failure to make a showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," will mandate the entry of summary judgment. *Celotex*, 477 U.S. at 322-23. The non-moving party may not rest upon the mere allegations or denials of his pleadings, but the response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts which demonstrate that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). The rule requires the non-moving party to introduce "evidence of evidentiary quality" demonstrating the existence of a material fact. *Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997); *see Anderson*, 477 U.S. at 252 (holding that the non-moving party must produce more than a scintilla of evidence to survive summary judgment). "A genuine issue of material fact exists if a reasonable juror could return a verdict for the nonmoving party." *Pucci v. Nineteenth Dist. Ct.*, 628 F.3d 752, 759 (6th Cir. 2010).

"Rule 56(e)(2) leaves no doubt about the obligation of a summary judgment opponent to make [his] case with a showing of facts that can be established by evidence that will be admissible at trial.... In fact, '[t]he failure to present any evidence to counter a well-supported motion for summary judgment alone is grounds for granting the motion.' Rule 56(e) identifies affidavits, depositions, and answers to interrogatories as appropriate items that may be used to support or oppose summary judgment." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009) (quoting

15

*Everson v. Leis*, 556 F.3d 484, 496 (6th Cir. 2009)).

"In reviewing a summary judgment motion, credibility judgments and weighing of the evidence are prohibited. Rather, the evidence should be viewed in the light most favorable to the non-moving party." *Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 374 (6th Cir. 2009) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). "Thus, the facts and any inferences that can be drawn from those facts[ ] must be viewed in the light most favorable to the non-moving party." *Id.* (alteration in original) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) and *Bennett v. City of Eastpointe*, 410 F.3d 810, 817 (6th Cir. 2005)). "For cross-motions for summary judgment, we must evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the non-moving party." *Spectrum Health*, 410 F.3d at 309 (internal quotation marks and citation omitted).

## III.   ANALYSIS

The sole issue presented in these cross motions is whether the Policy language clearly and unambiguously supports the denial of Plaintiff's claim for benefits based on Mr. Filek's death as a result of a pulmonary embolism. Interpretation of this insurance policy is guided by the same principles that apply to the construction of all contracts:

> The same contract construction principles apply to insurance policies as to any other type of contract because it is an agreement between the parties. Thus an insurance policy must be read as a whole to determine and effectuate the parties' intent. The terms of the contract are accorded their plain and ordinary meaning. If the contractual language is unambiguous, courts must interpret and enforce the contract as written because an unambiguous contract reflects the parties' intent as a matter of law. Clear and specific exclusionary provisions must be given effect, but are strictly construed against the insurer and in favor of the insured.

*Hastings Mut. Ins. Co. v. Safety King, Inc.,* 286 Mich. App. 287, 291-92 (2009) (citations omitted). The Court "must enforce the insurance policy in accordance with its terms as interpreted in light of

16

their commonly used, ordinary, and plain meaning [but] will not rewrite an insurance policy under the guise of interpretation or create an ambiguity where none exists." *McKusick v. Travelers Indem. Co.*, 246 Mich. App. 329, 338 (2001) (citations omitted). Ambiguities are resolved in favor of the insured but a policy is not necessarily ambiguous simply because a term is left undefined:

> While we construe the contract in favor of the insured if an ambiguity is found, *Auto Club Ins. Ass'n v. DeLaGarza*, 433 Mich. 208, 214, 444 N.W.2d 803 (1989), this does not mean that the plain meaning of a word or phrase should be perverted, or that a word or phrase, the meaning of which is specific and well recognized, should be given some alien construction merely for the purpose of benefitting an insured. *Upjohn Co, supra* at 208, n. 8, 476 N.W.2d 392. The fact that a policy does not define a relevant term does not render the policy ambiguous. *Auto Club Group Ins. Co. v. Marzonie*, 447 Mich. 624, 631, 527 N.W.2d 760 (1994). Rather, reviewing courts must interpret the terms of the contract in accordance with their commonly used meanings. *Group Ins. Co. of Michigan v. Czopek*, 440 Mich. 590, 596, 489 N.W.2d 444 (1992).

*Henderson v. State Farm Fire and Cas. Co*., 460 Mich. 348, 354 (1999).

The dispositive issue before the Court, whether a pulmonary embolism is a bodily injury caused by an accident, has been addressed by other courts, albeit in slightly different contexts. For example, in *Bliss v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 132 F. Supp. 3d 676 (D. Md. Sept. 17, 2015), Mr. Bliss was insured under a blanket accident insurance policy when he died of a pulmonary thromboembolism three days after returning from a sixteen hour flight home from a work-related trip in Kenya. *Id*. at 677-78. Mrs. Bliss filed a claim under the policy and a National Union claims examiner denied the claim, noting that there was no evidence that Mr. Bliss had suffered any injuries on the trip and the medical examiner found no evidence of blunt force trauma or penetrating of the trunk or lower extremities. *Id*. at 678. The claims examiner found "that the death was the result of an internal, biological process caused by prolonged sitting on an airline flight and was not the result of bodily injury caused by an accident." *Id*. Mrs. Bliss appealed the denial

which was upheld by National Union's appeal committee and ultimately filed a complaint in federal court seeking to enforce her interpretation of the provisions of the policy.

As in this case, "Injury" was defined under the Bliss policy as "bodily injury *caused by* an accident . . . ." *Id.* at 679 (emphasis in original). "Accident" was not defined under the policy but the "accident" was required to occur during a covered work-related hazard, in this case the insured's covered trip to Kenya. The medical examiner attributed the death to the long airline flight home from Kenya but the court concluded that even assuming the truth of the medical examiner's statement, death due to the long airline flight would not constitute an "accident" under the policy. The court first endeavored to ascertain the plain meaning of the term accident:

> Because the word "accident" is not defined in the Policy, Mrs. Bliss points to the dictionary definition of the term which includes: (1) "an unforeseen and unplanned event or circumstance"; (2) "an unfortunate event resulting especially from carelessness or ignorance"; (3) "an unexpected and medically important bodily event especially when injurious"; and (4) "an unexpected happening causing loss or injury which is not due to any fault or misconduct on the part of the person injured but for which legal relief may be sought.

132 F. Supp. 3d at 680 (quoting *Merriam-Webster.com*). The court noted that the Fourth Circuit has similarly defined the term accident to include "an unforeseen and unplanned incident," or "an unintended occurrence." *Id.* at 680-81 (quotation marks and citation omitted). Similarly, the court observed, the Supreme Court has described an accident in a related context "'as something unforeseen, unexpected, extraordinary, [or] an unlooked-for mishap.'" *Id.* at 681 (quoting *Landress v. Phoenix Mut. Life Ins. Co.*, 291 U.S. 491, 495-96 (1934)). The court rejected Mrs. Bliss's argument that because Mr. Bliss's death was not intended or expected, it was an accident. The court drew an important distinction, also drawn by the Supreme Court in *Air France v. Saks*, 470 U.S. 392 (1985) when called upon to interpret similar language in Article 17 of the Warsaw Convention,

18

between an "accidental cause" and an "accidental result" in the context of an accident insurance

policy:

> Here, the Policy itself settles the means vs. result question in that it covers an injury resulting in death and defines injury as a "bodily injury caused by an accident." ECF No. 1–2 at 8 (emphasis added). Thus, by the clear language of the Policy, there must be an accident apart from the injury itself that serves as the cause of that injury. The pertinent question then is what is the accident that caused Mr. Bliss' injury? Is it the seemingly uneventful but lengthy flight? To declare that an accident would be to ignore the definitions provided both by dictionaries and case law as there was nothing unusual or unexpected about the flight. Is it the internal, biological process leading to the formation of the pulmonary thromboembolism? That would be the injury itself. Thus, there is no accident that Plaintiff can point to as the cause of Mr. Bliss' injury.
>
> The Supreme Court's interpretation of the common understanding of "caused by an accident" as it is found in Article 17 of the Warsaw Convention is informative in this regard. Article 17 "establishes the liability of international air carriers for harm to passengers." Under Article 17,
>
>> The carrier shall be liable for damage sustained in the event of the death or wounding of a passenger or any other bodily injury suffered by a passenger, if the accident which caused the damage so sustained took place on board the aircraft or in the course of any of the operations of embarking or disembarking.
>
> Like the accidental insurance contract in this case, the Warsaw Convention does not otherwise define the term accident. . . . The Court explained that typically when an accident is used to describe the cause of an injury, it is an "unexpected or unusual" event that is external from the passenger. *See* [*Saks,* 470 U.S.] at 400, 405, 105 S.Ct. 1338. Thus, because Article 17 indicates that the accident must cause the injury, the accident must be an event, separate from the injury, that causes the injury. *See id*. The Court concluded that if an injury results from "the passenger's own internal reaction to the usual, normal, and expected operation of the aircraft, it has not been caused by an accident." *Id*. at 406, 105 S.Ct. 1338.

132 F. Supp. 3d at 681-82 (quoting *Saks, supra*).  Language in an accident policy that requires that

the injury be "caused by an accident" thus clearly and unambiguously requires "an accident apart

from the injury itself that serves as the cause of the injury."  *Id*. at 682.

"Injury" is defined in Mr. Filek's Occupational Accident Policy as "bodily injury to an Insured Person *caused by an Occupational accident* while coverage is in force under this Policy, which results directly from and independently of all other causes in a Covered Loss." Pl.'s Mot. Ex. B, Policy, Section IV, PgID530 (emphasis added). This Policy language, like that in *Bliss* and *Saks*, contains the magic causation requirement – bodily injury caused by an accident. In this case, as in *Bliss* and *Saks*, there was no "unexpected or unusual" external event that caused Mr. Filek's pulmonary embolism. Like the long but otherwise uneventful flight in *Bliss*, Mr. Filek's prolonged sitting in his truck was neither unexpected nor unusual. In fact, according to Dr. Adelstein, a pulmonary embolism is a "common risk" to long-haul truck drivers, well known and studied in the literature, such that those who choose such an occupation would do well, in Dr. Adelstein's opinion, to take breaks every 3-4 hours, get out of their trucks to move around and wear compression stockings while driving. Like the well-known risk of a pulmonary embolism among those on long airplane flights, the risk of such an event to someone such as Mr. Filek, who choose to drive a truck for a living, was neither "unexpected" nor was it "external" to the person who suffered it. *Saks*, 470 U.S. at 400, 405. *See also Appeldorn v. Hartford Life and Acc. Ins. Co.*, No. 09-cv-069, 2010 WL 3475915, at *2 (D.N.D. Sept. 2, 2010) (holding that insured's internal reaction (suffering a pulmonary embolism) to ordinary conditions on an uneventful airplane flight (i.e. pressurization of the cabin) does not constitute an "accident" under the policy); *Williams v. Nat'l Union Fire Ins. Co.*, No. 12-cv-01590, 2013 WL 1431822, at *9 (S.D. Cal. April 9, 2013) (holding that passenger's development of a massive pulmonary thromboembolism after spending 28 hours over a five day period on long flights was not "an unexpected or unusual event or happening that is external to the passenger" and thus not an "accident" under an accidental insurance policy). The pulmonary

20

embolism was Mr. Filek's own internal reaction to prolonged sitting (assuming Plaintiff's version of the facts), an occurrence that was neither unusual nor unforeseen for a long-haul truck driver.

In *Rynerson v. Nat'l Cas. Co*., 203 Mich. App. 562 (1994), the Michigan Court of Appeals addressed the definition of "accidental" in the context of an accident insurance policy providing benefits for "accidental bodily injury" that is the "direct result of an accident."  The insured in *Rynerson*, according to expert medical testimony, suffered a massive cerebral hemorrhage as a result of the strain he exerted when attempting to fix his truck while in the course of delivering newspapers for his employer.  He was insured under a group accident insurance policy for "loss due to injury" under which "injury" was defined as "accidental bodily injury sustained by the Insured which is the direct result of an accident, independent of disease or bodily infirmity or any other cause."  *Id*. at 563.  Thus the policy, like the Filek Policy, required that the bodily injury be "caused by," i.e. be the "direct result of" an accident and, like the Filek Policy, required that the injury result "independently of all other causes."  *Id*. at 567; Pl.'s Mot. Ex. B, Policy, GENERAL DEFINITIONS, PgID 530.  The *Rynerson* court concluded that the language unambiguously precluded recovery for plaintiff's cerebral hemorrhage which may have been an accidental injury but was not caused by an accident:

> The policy in this case entitles plaintiff to benefits for an "accidental bodily injury ... which is the direct result of an accident. . . ." The clear meaning of the language requires not only an accidental injury, but an "accidental means" or accidental cause as well. This combination of phrases unambiguously indicates that the unexpected nature of the injuries following voluntary acts does not, by itself, entitle an insured to benefits under the policy. The incident or activity that is the cause of the accidental injury must also be accidental.
>
> Plaintiff contends that, because the decedent's strenuous activity was not work-related and was abnormal or unusual for him, the activity should be considered accidental. We disagree. Recovery under this provision requires not only that the injury be accidental, but that it be the direct result of an accident. An accident has

been defined as "an undesigned contingency, a casualty, a happening by chance, something out of the usual course of things, unusual, fortuitous, not anticipated, and not naturally to be expected." *See Guerdon Industries, Inc. v. Fidelity & Casualty Co. of New York*, 371 Mich. 12, 18-19, 123 N.W.2d 143 (1963), quoting 10 Couch, Insurance (2d ed.), § 41:7, p. 9. The decedent's attempt to repair his truck and his voluntary exertion in an attempt to unscrew a bolt does not constitute an "accident."

203 Mich. App. at 567.

This Court will follow the reasoning of the courts in *Saks*, *Bliss*, *Williams* and *Rynerson* to conclude that the language of the Filek Policy, which expressly required that "bodily injury" be "*caused by* an occupational accident," and occur "independent of all other causes," does not cover Mr. Filek's pulmonary embolism which was Mr. Filek's "own internal reaction" to the ordinary performance of his job, *i.e.* sitting for a prolonged period of time, and was not an unexpected or unusual event that was external to the insured. The "accident inquiry" based on the policy language in this case, requires "some link in the chain [that] was an unusual or unexpected event external" to the insured. *Willams*, 2013 WL 1431822, at *9 (quoting *Olympic Airways v. Husain*, 540 U.S. 644, 652 (2004)). To be sure, the analogy to the interpretation of the same term used in the Warsaw Convention is not a perfect one but is one that several other courts have drawn upon in interpreting the language of similar accidental insurance policies. National Union could have been more precise in by further defining "accident," as the policy did in *Williams*, as something "external to the body." *See Williams*, 2013 WL 1431822, at *11 ("Here, the express language of the Policy defines injury as something that is "external to the body," and the interpretation of such language has consistently been held to exclude development of DVT."). That the Policy could have been more clear, however, does not necessarily render it ambiguous. As the court noted in *Williams*, the language of the Warsaw Convention contained no such express "external to the body" language yet the term "accident" was interpreted in *Saks* as requiring just such a showing. Several courts have adopted

22

the "external to the body" requirement with regard to accidental occurrence policies that contained no such express language. *See, e.g. Appeldorn, Williams* and *Bliss*, *supra*. *But see Yasko v. Reliance Standard Life Ins. Co*., 53 F. Supp. 3d 1059 (N.D. Ill. 2014) (court adopted an interpretation which asked only if the deceased had a subjective expectation of survival and whether that expectation was reasonable and also relied on a clause in the policy covering injury flowing from "accidental exposure to the elements," which the court interpreted as including "exposure to high altitudes while flying").

Even if the Court were to conclude that Mr. Filek's pulmonary embolism was an "injury" under the Policy, Defendant argues additionally that a pulmonary embolism is "a sickness or disease" and therefore falls under the second Exclusion of Section VI of the Policy which excludes from coverage any losses caused in whole or in part by "sickness, disease or infections." Pl.'s Mot. Ex. B, Policy, Section VI, PgID 543. The Physician's Desk Reference categorizes a pulmonary embolism under "diseases and conditions." *See* http://www.pdrhealth.com/diseases/blood-clots-pulmonary-embolism. Likewise, the Merck Manual categorizes pulmonary embolism as a "lung and airway disorder." *See* http://www.merckmanuals.com/home/lung-and-airway-disorders/pulmonary-embolism. In *Fairley v. Great American Ins. Co*., No. 13-cv-98, 2014 WL 3509811 (S.D. Miss. July 14, 2014), the court found that a fatal pulmonary embolism, suffered by a truck driver parked in his truck at a truck stop, was barred by an occupational accident insurance policy that excluded losses "caused by sickness or disease." The insured in *Fairley*, like Mr. Filek, suffered a saddle pulmonary embolism which, the court concluded, fell squarely within the everyday meaning of the word sickness and within multiple dictionary definitions of disease:

> The policy excludes "any . . . loss caused in whole or in part by, or resulting in whole or in part from . . . sickness, disease or infection of any kind . . .," but it does not

23

provide a definition for the terms "disease" or "sickness." Under Mississippi law, "words, terms, phrases, and clauses in insurance contracts are to be given their everyday meanings, not hypertechnical or esoteric definitions, but their plain and common meaning." *McFarland v. Utica Fire Ins. Co.*, 814 F. Supp. 518, 525 (S.D.Miss. 1992), *aff'd*, 14 F.3d 55 (5th Cir. 1994).

It is beyond dispute that the condition which caused Mr. Fairley's death—a pulmonary embolism—falls within the common, everyday meaning of the word "sickness." Furthermore, Plaintiff's own expert described Mr. Fairley's condition as a "disease," and it falls within multiple dictionaries' definitions of "disease" and "sickness." The Court concludes, therefore, that Plaintiff's claim for survivor benefits is barred by the policy's "sickness and disease" exclusion. *Cf. Cumbest v. Gerber Life Ins. Co.*, No. 1:07–CV–968–WJG–JMR, 2009 U.S. Dist. LEXIS 85152, at *29–*30, 2009 WL 3011217 (S.D. Miss. Sept.16, 2009) (where policies provide that an accident must be "directly and independently" the cause of a loss, the general rule is that if disease is a concurrent proximate cause, the insurance company is not liable) (citing *Sekel v. Aetna Life Ins. Co.*, 704 F.2d 1335, 1338 (5th Cir.1983)).

2014 WL 3509811, at *3 (footnotes omitted). Like the policy in *Fairley*, the Filek policy excludes loss as a result of "sickness and disease" and provides that the accident must "directly and independently" cause the loss. Pl.'s Mot. Ex. B, Policy Section I, PgID 530. Thus, even if Plaintiff could establish an Injury under the policy (which, as discussed *supra*, Plaintiff has not done here), coverage would be denied under the "sickness or disease" exclusion.

Dr. Adelstein ruled Mr. Filek's death natural. Dr. Adelstein clearly stated that there was no evidence of any trauma or some type of traumatic accident that caused or contributed to the pulmonary embolism. Adelstein Dep. 53:11-18. Mr. Dawson's examples of accidents resulting in death that might be covered under Accidental Death provision of the Policy – a slip and fall, a motor vehicle accident, getting struck by a door or by objects falling, stepping in a hole while unloading – all meet the definition adopted by the courts in *Saks, Bliss,* and *Williams*, that is to say unexpected, unforeseen physically traumatic events external to the insured. Mr. Filek's pulmonary embolism was "the result of an internal, biological process," perhaps contributed to by his choice of occupation

as a truck driver, which resulted in Mr. Filek sitting for prolonged periods of time, but clearly *not* caused by an external unexpected traumatic event and therefore not caused by an occupational *accident* as required for a covered loss under the Policy.

In this case, Mr. Filek purchased occupational accident insurance, not life insurance, and the premium he paid likely reflected the much more limited nature of the coverage. "Under [Plaintiff's] interpretation, almost any death would be an accident, and the Court would effectively transform this accidental death benefit into a life insurance policy." *Bliss*, 132 F. Supp. 3d at 683 (noting that typically an accidental death policy is available for significantly lower premium than a life insurance policy and the former should not be transformed to the latter to cover situations "not intended actuarially") (internal quotation marks and citation omitted). National Union correctly denied coverage under the terms of the Occupational Accident Policy Mr. Filek purchased.

## IV.    CONCLUSION

For the foregoing reasons, the Court GRANTS Defendant's Motion for Summary Judgment, DENIES Plaintiff's Motion for Summary Judgment, DENIES AS MOOT Plaintiff's Motion to Strike Defendant's Expert and DISMISSES Plaintiff's Complaint WITH PREJUDICE.

IT IS SO ORDERED.

s/Paul D. Borman
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated:  September 29, 2016

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on September 29, 2016.

s/Deborah Tofil
Case Manager